76 So.2d 761

**Luther M. LACKEY**

v.

**Jesse J. LACKEY.**

**8 Div. 764.**

Supreme Court of Alabama.

Oct. 28, 1954.

Rehearing Denied Jan. 13, 1955.

Rogers, Howard & Redden, Birmingham,
H. G. Bailey, Boaz, for appellant.

48

Scruggs & Scruggs, Guntersville, and Mack Killcrease, Albertville, for appellee.

STAKELY, Justice.

This is a contest of the will of G. W. Lackey, deceased, by one of his children, Luther Lackey (appellant). The will was executed May 29, 1951. G. W. Lackey died February 23, 1953. The proponent of the will is Jesse Lackey (appellee), another son of G. W. Lackey. The grounds of the contest are, briefly, mental incapacity and undue influence. There was a verdict in favor of the proponent and the will. Motion for new trial was overruled. Hence this appeal.

G. W. Lackey was survived by his widow Della Lackey and by eight children:—Mrs. Dovie Morton, Mrs. Nellie Tillery, Mrs. Mary Pierce, Mrs. Ruth Matthews, Luther Lackey, Jesse Lackey, Fred Lackey, Mrs. C. E. Bice, three children of Earnest Lackey, deceased son of the decedent, two of whom are minors, and June Trammell, a daughter of Eddie Lackey, who was also a deceased son of the decedent. Jesse Lackey was named as executor of the will.

Assignment of error 2. Error is predicated on the action of the court in giving the affirmative charge requested by the proponent on the issue of undue influence. This court has repeatedly held on the question of undue influence that the burden is on contestants, in order to raise a presumption of undue influence, to prove a dominant confidential relationship and undue activity in the execution of a will by or for a favored beneficiary. Hyde v. Norris, 250 Ala. 518, 35 So.2d 181; Wilson v. Payton, 251 Ala. 411, 37 So.2d 499, 500. Appellant takes the position that there was sufficient evidence to raise a presumption of undue influence and hence the question of undue influence was for the jury.

It was said in Wilson v. Payton, supra, that "It is presumed prima facie that in transactions between parent and child the parent is the dominant party and that

they are free from undue influence, and in such cases the burden is upon contestant to show that time and circumstances have reversed the order of nature, and that the dominance of the parent has been displaced by subservience to the child." Hawthorne v. Jenkins, 182 Ala. 255, 62 So. 505, Ann. Cas.1915D, 707. The proof in the case at bar showed that when the decedent executed the will of May 29, 1951, he was 86 years and 10 months old. His son Jesse at that time had been a partner in the mercantile business with his father, which was operated at Boaz, Alabama, since January 1, 1945. Jesse Lackey was an active figure not only in the mercantile business but in aiding in the operation of the farms of his father which aggregated about 1,000 acres. There are many circumstances which tend to show that the father was still the dominant figure as, for example, when he determined the price which should be required when timber off of some of his land was sold, but without going into detail, it may be that there was evidence from which the jury could infer that the younger man had become the dominant party as between the two, because of his greater activity in the business and his greater physical vigor. This leaves us to a consideration of the activity of Jesse Lackey in and about the preparation and execution of the will and whether it could be said that he was a favored beneficiary.

The evidence is voluminous and we cannot undertake to set it out in detail, but, in summary, it showed without dispute that D. K. Searcy, who was a witness for the proponent, had been the banker of G. W. Lackey practically all of the time since 1913. It is without dispute that several months before the will was made, G. W. Lackey came to him and wanted him to write a will. Mr. Searcy suggested that G. W. Lackey get an attorney to prepare the will. Mr. Lackey asked Mr. Searcy what attorney to get and Mr. Searcy named over several attorneys and when the name of Mr. Mack Killcrease was called, Mr. Lackey said that he was the attorney whom he wanted to be called.

Before G. W. Lackey became ill in May 1951 he went to town every day and some-times twice a day. In the early part of May 1951 and on the first day that his father did not come to town, Jesse went to see his father and he told Jesse to get Mr. Searcy to come over, that he wanted to make a will. At this time Mr. Lackey asked Jesse, "I want to know if you will take care of your mother?" and he further said, "Somebody is going to have to do it and it looks like you are the only one that is going to do it." Jesse told his father that as long as he had a dollar, he would look after his mother. In this conversation Jesse did not say anything to his father about the will and did not say anything to him about how the will should be made. Jesse did not know that his father had had a previous conversation with Mr. Searcy with reference to the will.

After Mr. Searcy was informed by Mr. Lackey that he wanted to make a will, he called Mr. Killcrease over the telephone and asked him to come over to Boaz to write the will with the result that Mr. Killcrease came to Boaz and in the company of Mr. Searcy went to see Mr. Lackey. There were four discussions on different occasions with reference to the will. On the first day that the will was discussed, Jesse Lackey not being present, Mr. Killcrease in the presence of Mrs. Lackey and Mr. Searcy talked with Mr. Lackey about the will and took notes from which to draft the will. Mr. Lackey told Mr. Killcrease what to put in the will and calling the name of each child, told him what he wanted each child to have. Mr. Killcrease suggested that a tax consultant be called and he suggested a Mr. Newby, which was satisfactory to Mr. Lackey. No will was made on that first day, Mr. Killcrease doing no more than making a memorandum of what Mr. Lackey wanted. Mr. Lackey expressly told what he wanted June Trammell to have and suggested the forfeiture clause in the event of the contest of the will.

On the second visit the tax expert, Mr. Henry B. Newby, went to Mr. Lackey's home with Mr. Killcrease and Mr. Searcy. No will was made at this second conference. In this conference the effect of estate taxes was discussed and suggestions were made as to how taxes could possibly be saved.

Mr. Newby then suggested that the property be appraised. Mr. Lackey discussed the debts which were owed to him by various children and their husbands and wives. Mr. Newby then suggested that a list of the accounts of the children who were then living be made. No one suggested to Mr. Lackey anything about what he ought to put in his will. This is the only conference when Jesse Lackey was present, but he made no statement as to what to be put in the will. He came and went to his father's home in a separate car. On this second occasion Mrs. Lackey was present and also Mr. Searcy. On this occasion Mr. Newby told Jesse Lackey to get up the accounts of the various children with their father and to obtain appraisals of the land belonging to Mr. Lackey. None of the accounts of the children had been paid and it was expressly understood that none of the accounts were expected to be paid.

On the day of the third conference those present were Mr. Searcy, Mr. Killcrease and Mr. and Mrs. Lackey. On this day Mr. Killcrease brought a rough draft of the will which was read to Mr. Lackey. When the will was read to Mr. Lackey, Mr. Lackey wanted the description of the property changed in several respects, naming the description which he wanted Mr. Killcrease to use. After receiving the corrected descriptions, Mr. Searcy and Mr. Killcrease went to the bank of Mr. Searcy, where Mr. Searcy attempted to retype the will. The will was drawn exactly as Mr. Lackey had told them. However there were typographical errors, misspelled words and erasures in the will. Nevertheless the will was taken back to Mr. Lackey's home where the will was read to Mr. Lackey and executed by Mr. Lackey with the idea that Mr. Killcrease would recopy the will as soon as possible in order to eliminate typographical errors, misspelled words and erasures. The only ones present when the will was signed were Mr. Searcy, Mr. Killcrease and Mr. and Mrs. Lackey.

On the day of the fourth conference on May 29th 1951, when the will in its final form was duly executed, the only ones present were Mr. Killcrease, Mr. Searcy and Mr. and Mrs. Lackey. Before execution of the will it was read to Mr. Lackey and he expressed his satisfaction with it, stating that that was what he wanted. As we have said, the only change between the May 29th will and the previous will was a matter of form in order to correct typographical errors, misspelled words and erasures to produce a neater instrument.

■ It appears from the foregoing statement of the evidence that Jesse Lackey made no suggestion to his father as to what lawyer should be chosen to draft the will. He was present at only one of the four conferences which were had with respect to the will and he was at that conference for the purpose of furnishing a statement of his father's accounts with the various children because he kept the books of his father and was familiar with these accounts. He was also asked to secure appraisals of the various properties for the benefit of the tax expert. There was no proof whatever that he made any suggestion as to how the will should be made or what bequests should be made either to himself or any other child of the deceased. Mr. Lackey had the advice and counsel of his banker, of an attorney of his choice and of a tax consultant. He told them exactly what he wanted done with his property, named the objects of his bounty and expressed satisfaction with the will after it had been read to him. We, therefore, do not see how it can be said that there was any undue activity on the part of Jesse Lackey in procuring the will or with reference to the execution of the will. In Mindler v. Crocker, 245 Ala. 578, 18 So.2d 278, 281, it was pointed out by this court that, "Activity must be more than conduct referable solely to a compliance with or obedience to the free and voluntary instructions or directions of testatrix." Zeigler v. Coffin, 219 Ala. 586, 123' So. 22, 63 A.L.R. 942; Kahalley v. Kahalley, 248 Ala. 624, 28 So.2d 792.

We have said enough to dispose of every presumption of undue influence, but can it be said that under the circumstances of the case Jesse Lackey was a favored beneficiary? Jesse Lackey for several years had lived in a home which belonged to his fa-

ther, but his father had never given·to him a home or farm or other real estate. On the other hand, G. W. Lackey had bought each of his children, except Jesse Lackey, a home and had given the same to them during his lifetime. Before his death, G. W. Lackey gave to his son Luther 240 acres of land worth $40 per acre. Jesse Lackey had worked for his father since the latter part of 1923 with the exception of the summer of 1924. On June 1, 1945, Jesse Lackey became a partner in the mercantile business of his father operated at Boaz, Alabama. From the time when Jesse first started working for his father in 1923 until he became a partner in the business in 1945 he received only the amount of $60 per month as a salary for his work. From the time he first began working with his father until his father's death, he assisted his father in looking after the farms of his father which totaled over 1,000 acres. After he became a partner·in the business he did not receive any salary whatsoever from his father for looking after the farms and business. The only provision of the will which in any way gave to Jesse Lackey anything other than his equal share in the residue of the estate, which all the other children received except June Trammell, was paragraph 3, which reads as follows:

"3. I will and bequeath to my beloved wife, Della Lackey, the dwelling house and lot, consisting of Five acres, more or less, and the small tenant dwelling on Line Street on said Five acres, all of said land being on the East side of the railroad now occupied by myself and my said wife, Della Lackey, for and during her lifetime, and upon her death I will and bequeath said property in fee simple to my son Jesse Lackey, or his heirs. Inasmuch as my said son Jesse Lackey operated my mercantile business and looked after my other interests, including my farms, for a long number of years for a very small salary, and since he was sold a one-half interest in said mercantile business some six years ago, he has operated said business and looked after my farms and other interests without any salary, this bequest is being made, and same shall not be charged against his distributive share in the remainder of my estate, nor shall his distributive share be diminished by this bequest upon a final settlement of my estate."

Della Lackey, the widow, received property under the will, including the property referred to in paragraph 3, totaling around one-half of the estate according to the appraisal. In Cook v. Morton, 241 Ala. 188, 1 So.2d 890, 892, in discussing the question as to who is a favored beneficiary, it was said: "One who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty. An unnatural discrimination, leading to a natural inference that advantage has been taken by one in position so to do; and shown to have been busy in getting·such will executed." See Mindler v. Crocker, 245 Ala. 578, 18 So.2d 278.

Appellant emphasizes the proposition that June Trammell, decedent's granddaughter, was bequeathed only a life estate in a building that produces a rental of about $40 per month and is not in a state of good repair. She had lived with her grandparents and had been supported by them from the time when her father was killed when she was six years of age until her marriage when she was sixteen years of age. We do not know why June Trammell was left out of the residuary estate. But that is the way G. W. Lackey wanted it according to the undisputed evidence. There is no evidence that Jesse Lackey in any way had anything to do with the legacy to June Trammell. We do not think that inequality in the bequest to this granddaughter under the circumstances here involved can be said to make Jesse Lackey a favored beneficiary. Assuming that he received more under the will than he would have received under the laws of distribution in case of intestacy, that is not the test. Mindler v. Crocker, supra.

Under all the circumstances we do not see how it can be said that Jesse Lackey was a favored beneficiary.

Upon a careful consideration of the evidence we consider that the court acted correctly in giving the affirmative charge in favor of the proponent on the question of undue influence.

Assignments of error 3, 16, 17 and 33. During the course of the trial the court made several remarks which appellant insists were comments by the court upon the credibility of the evidence and the weight and sufficiency of the testimony, thus in effect charging the jury in regard to the effect of the evidence in violation of § 270, Title 7, Code of 1940. During the testimony of D. K. Searcy, a witness for the proponent, counsel for the contestant from time to time made objections to questions which were considered leading. At one point the court, having overruled such objection, stated: "I don't think you can lead Mr. Searcy anyway." It is sufficient to say that when the court made this statement, there was no objection or exception.

During the course of the examination of the witness Dr. Wm. J. Tally, there was objection to a question asked the doctor on the ground that there was no testimony in the record for a hypothetical question of that kind and on undue influence. The court said: "I agree on your premise. I will let him answer that. If it is not connected up, I will let it be excluded due to the fact that he is from out of town." As has been pointed out the court correctly gave the affirmative charge on the ground of undue influence, which was the premise for the statement of the court. There is obviously no error here.

The basis for the assignment of error 17 is the following comment by the court during the examination of the witness Dr. Wm. J. Tally: "You mean he might also be stubborn?" It is sufficient to say that there was no reservation of an exception to this question by the court. We might add that of course the trial judge has the right to propound such questions to witnesses as may be necessary to elicit pertinent facts. 58 Am.Jur 310.

Assignments of error 4, 5 and 12. These assignments are based respectively on the action of the court in sustaining objections of proponent to the following questions propounded to the following witnesses: (a) "What was his condition and appearance then at that time?", propounded to the witness James Morton. (b) "How did he appear at that time?", propounded to the witness James Morton. (c) "How did he appear to you from a physical standpoint?" and "What was his appearance?", propounded to the witness Fred Lackey. Prior to asking the witness Morton the two questions no facts had been elicited from the witness showing that he was qualified to answer the questions and such being so, the trial court properly sustained the objection. Capital Motor Lines v. Gillette, 235 Ala. 157, 177 So. 881; Southern Railway Co. v. Taylor, 148 Ala. 52, 42 So. 625; Scott v. State, 34 Ala.App. 18, 37 So.2d 670, certiorari denied. 251 Ala. 440, 37 So. 2d 674. Besides the witness was later permitted to testify in detail as to certain things he observed as to Mr. Lackey's appearance, statements, physical condition and mental condition. In fact, he was allowed to answer the two questions heretofore referred to. There is no prejudicial error in sustaining an objection to a question where such testimony is admitted at another time or in another form. Sovereign Camp, W. O. W. v. Davis, 242 Ala. 235, 5 So.2d 480.

With reference to the questions propounded to the witness Fred Lackey, he testified as to no facts upon which such an opinion could be based. No facts were elicited from the witness to show that he was qualified to answer the questions. Before a witness may testify as to the physical condition of a person, he must first testify as to familiarity with such condition and whether such witness possesses the requisite qualifications is a preliminary question within the discretion of the court. Capital Motor Lines v. Gillette, supra; Scott v. State, supra.

Assignment of error 7. Error is predicated on the action of the court in

excluding the testimony of Ed Bradberry. He testified that on one occasion, the time of which occasion he was not able to fix except that it was either in 1951 or 1952, Mr. Lackey failed to recognize June Trammell. He did not talk with Mr. Lackey on that occasion. He did not know whether this was before or after Mr. Lackey went to the hospital. The court excluded the testimony as being too indefinite or remote. Our cases, such as Price v. Marshall, 255 Ala. 447, 52 So.2d 149, and Tucker v. Tucker, 248 Ala. 602, 28 So.2d 637, show that on the question of insanity a wide range of evidence is allowable and the testimony showing instances either prior or subsequent to the execution of the will as to acts, declarations or conduct of the testator, is admissible if such evidence has a tendency to shed light on the mental capacity of the testator at the time of the execution of the will. Upon a consideration of the matter, however, and the entire record, we are not willing to put the court in error for excluding this testimony because of the indefiniteness to which we have referred and especially because such testimony was purely cumulative of other testimony. Several other witnesses testified as to Mr. Lackey's failure to recognize them, including June Trammell. Jenkins v. Avery, 257 Ala. 387, 59 So.2d 671; Supreme Court Rules, rule 45, Code 1940, Tit. 7 Appendix.

■ Assignments of error 8 and 9. These assignments relate to the action of the court in sustaining objections to hypothetical questions propounded to Dr. Finney. However, in each instance the witness was subsequently permitted to testify fully as to the facts sought to be elicited by each of the questions. There is accordingly no prejudicial error here. Sovereign Camp, W. O. W. v. Davis, 242 Ala. 235, 5 So.2d 480.

■ Assignments of error 10, 14 and 15. These assignments are predicated upon questions directed to Fred Lackey, Wayland Bruce and Glenn Scott and sought an expression of opinion on the part of the witness in regard to the soundness or unsoundness of testator's mind. At no time, however, previous to the question did the witness testify as to any actions of Mr. Lackey that he had observed from which such an opinion could be based. Where a lay witness is called to give an opinion in a matter of this kind, a condition precedent to the admission of such an opinion is that the non-expert witness must not only have had an opportunity to form a judgment with respect to the person's mental status, but the facts should be stated upon which it is based. Wear v. Wear, 200 Ala. 345, 76 So. 111. Whether the witness was qualified to deliver an opinion is a question to be submitted to the sound judicial discretion of the trial court. We do not think that in either of these instances the witness had been so qualified as to put the court in error in sustaining the objection to the question addressed to the witness.

■ Assignment of error 18. The trial was concluded on January 30, 1954. The motion for a new trial was filed on February 22, 1954. On March 12, 1954, the day set by the court for the hearing of the contestant's motion for a new trial, the appellant filed an amendment to the motion for a new trial setting up alleged misconduct of Jack Scott, one of the members of the jury. This amendment was stricken on motion of the proponent. The matters sought to be added were merely an elaboration upon the grounds contained in the original motion and under the original motion the appellant had the full benefit of matters suggested by the amendment. We, therefore, do not think that any error can be predicated upon the ruling of the court. Inter-Ocean Casualty Co. v. Anderson, 245 Ala. 534, 17 So.2d 766.

■ Assignment of error 20. Assignment of error 20 states: "The trial court erred in stating to the jury after the jury had deliberated some two hours and at a time when the court reporter was not present that the witness, Mrs. Murdoch, was not present at the testator's home on the 29th of May, 1951." Judge Stone did not recall making any such statement to the jury. The juror Darnell, the juror Willis, Ed Scruggs and Mack Killcrease all testified that the judge, in response to the jury's question replied that he did not know.

Judge Stone's notes upon the subject which were made immediately after the jury retired state: "Jury came in at 3:15, asked about testimony of Mrs. Murdoch. Mr. Scruggs, Killcrease and Bailey present. Jury informed that it was question of fact and that court reporter was not available and Court did not remember. No objection made by either side." The following was said by this court in Rutledge v. Brilliant Coal Co., 247 Ala. 40, 22 So.2d 428, 430:

"Appellant also insists that the motion for a new trial should have been granted because of what the judge said to the jury after they came into the court from their deliberations on the case, and reported that they were unable to get together on a verdict. The court made certain statements to the jury, to which no exception was taken by either party. It is not therefore reversible error. Phoenix Ins. Co. v. Moog, 81 Ala. 335, 1 So. 108."

See also Continental Casualty Co. v. Ogburn, 186 Ala. 398, 64 So. 619.

Assignments of error 21, 22 and 23. It is sufficient to say that no exception was taken to the ruling of the court referred to in these assignments.

■ Assignment of error 26. There was no error in refusing contestant's written charge No. 1. This charge applied to the question of undue influence. The general charge with hypothesis was properly given as to the undue influence aspect of the case. It was said in Kilgore v. Atkinson, 227 Ala. 310, 149 So. 808, 809, that:

"The refused charges requested by contestant relating to undue influence are abstract, and, whether they assert correct principles or not, their refusal was without reversible error, since the affirmative charge was, we think, properly given on that issue."

■ There was no error in refusing contestant's written charge No. 4. The matters requested by this charge were substantially covered in the court's oral charge and the contestant's given charge No. 6. § 273, Title 7, Code of 1940.

■ Assignment of error 32. Upon the hearing on the motion for a new trial the contestant attempted to impeach the verdict by showing by three jurors a statement made by Jack Scott, a fellow juror, as to the credibility of Luther Lackey and Jesse Lackey, the alleged statement having been made during the deliberations of the jury. While one of the jurors testified that he did not hear Jack Scott and the other jurors testified that they did not pay any attention to the statement of Jack Scott, we prefer to call attention to the rule supported by many Alabama authorities, which is that the verdict of a jury may not be impeached by the testimony of a juror. In Gulf States Steel Co. v. Law, 224 Ala. 667, 141 So. 641, 645, it was said by this court:

"The court committed no error, when it declined to consider the affidavit of one of the jurors trying the case, who undertook to testify to his own and fellow jurors' action and conduct while considering the case. A due regard for the proper and orderly administration of the law, a proper regard for the solemnity of verdicts of jurors, as well as a sound public policy forbid that members of a jury, after they have made their deliverances in court, should be allowed to impeach their verdicts. To give consideration to such affidavits would tend to bring the law and its administration into disrepute."

See also Alabama Fuel & Iron Co. v. Powaski, 232 Ala. 65, 166 So. 782; Clay v. City Council of Montgomery, 102 Ala. 297, 14 So. 646; Alabama Fuel & Iron Co. v. Rice, 187 Ala. 458, 65 So. 402; Fortson v. Hester, 252 Ala. 143, 39 So.2d 649; City of Dothan v. Hardy, 237 Ala. 603, 18 So.2d 264, 122 A.L.R. 637.

■ In this connection we are cited to the provisions of § 7, Title 30, Code of 1940. There is nothing in this statute, however, which forms an exception to or is inconsistent with the general rule to which we have referred. Under the provisions of this statute while the jury is in its deliberations, if a juror declares a fact as of his own knowledge which could be evidence in the case, the jury is admonished and directed

56

forthwith to come back into court so that the juror may be sworn and examined as a witness. But this does not mean that after a jury has concluded its deliberations and returned its verdict that the verdict may be impeached by a showing of statements made by a juror during the deliberations.

 We have given careful consideration to other assignments of error not here mentioned, but we do not think that they merit discussion here. Upon a consideration of the entire record, it is our opinion that the judgment of the lower court is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.